Good morning. Good morning. If it pleases the Court, my name is Kamran Michael Alyari from Washington Law Group representing ENI, Engineering Network International. This appeal, of course, arises out of a summary judgment dismissal of ENI's claims. The trial court did not view, in our opinion, all the evidence in a light most favorable to ENI or draw reasonable inferences in ENI's favor. It's your position that there were material issues of fact and dispute and therefore a summary judgment should not have been granted? Absolutely, in a nutshell, Your Honor. You're going to identify some of those? I'm sorry? You're going to identify those material issues of fact? Correct. And I think our appeal brief, it was pretty comprehensive in terms of that. I just wanted today to point out perhaps some highlights of that. In regards to whether there was a written contract between ENI and RAU, the trial court, ER 188, line 4, describes what it calls the crucial issue as whether RAU's May 29th email, generally agreeing to the draft but also making some suggested changes, constitutes a valid acceptance leading to the formation of a contract. At ER 191, the trial court describes what happens if ENI's version of the May 29th email is the real version. The real email can be located at ER 81. In that version, RAU states, quote, I am generally agreeing to your suggested draft. RAU then starts a new paragraph which states, quote, the only change suggested is, and then he goes on to describe a suggestion that he would like to make regarding the payment term from two weeks to one week. On the other hand, what we refer to as the issue. Okay. This is May 29th. Yes. Two versions. I think we have to accept at summary judgment stage the version you would prefer. And then I go to the June 1 email, about which I don't think there's a dispute. And that seems to be a response from your client to Mr. RAU identifying open issues. Issues that haven't been resolved. I believe you're referring to the Donish email. Yes. The Donish email, in fact, I thought that was June 2nd. I think we incorrectly referred to it in our brief as June 1st. I apologize. The one I'm looking at says June 1st. Okay. Maybe it is. I'm looking at one that's labeled ENI 179 and SER 1131. And it's an email from Mr. Donish to Mr. RAU, a date Tuesday, June 1, 1995, 145 p.m. And it's a little blurry, but as I read it, it says, thanks for your email, accepting the contract draft. And I infer from that that it's – that follows from the email you were just discussing, as to which there are the disputed versions. And that next line says, there are two topics as followed to be resolved. It suggests to me, well, you've got a general acceptance, but we have these open issues yet, one of which is the identification of this lucent technologies and its clients for the non-compete clause, which is what this focus is all about here. Correct. Do we really have a contract if this term is still open, according to Mr. Donish's email? I believe what happened, Your Honor, in terms of viewing the evidence most favorable to us, is that RAU accepts the contract on May 29th. After that, Donish approaches, who's the vice president of marketing for ENI, he approaches RAU and says, you know what, we'd also like to add this and lucent's clients to this. And there's some discussion related to that. And ultimately, that never does become part of the contract. It's much like RAU's suggestion to change the payment term from two weeks to one week. It's not a material term. This would be a material term, but it was not accepted by RAU. Well, see, here's basic contract law. Counteroffer is not the same as an acceptance. Or you can't do both at the same time. And that suggests that, again, interpreting it your way, well, okay, there is agreement, only now we're really changing the agreement on what turns out to be a critical term because it's the non-compete clause that this is all about. That's correct, Your Honor. But I would argue that that is not, that that term that you're talking about, neither of the terms that are mentioned in that email were conditioned, they were not conditions of this contract. In other words, Donish didn't say, you know, unless you agree to these, there's no contract. They were simply. Well, no, he says there are two topics as followed to be resolved. And that's not the same as, okay, we're okay with this deal, but will you consider these additional clauses? It says there are two topics to be resolved. That's correct. And I think it may be in a way, of course, Donish is Iranian. Middle Eastern, I know, I'm half Iranian. They like to negotiate. So always everything is negotiated. I think that's probably his way in a second language of saying let's continue to negotiate. Let's take a second bite. We've got a deal, but I'm going to see if I can make it. Correct. Correct, Your Honor. I did want to point out when we're on the topic of this May 29th email, the different email, whether the real one or the altered one, that I can't escape looking at the altered email, what we call the altered email, which is an ER82, and noticing that it's essentially the same email except in the first paragraph something's been added. And what's been added is this material term about, no, Rao is now saying, no, I'm not going to agree to the non-solicitation clause. However, he leaves the second paragraph the same. So after saying in the first paragraph, no, I have this one change, he starts the paragraph, the second paragraph, the same as in the real email, with only change suggested is. So, I mean, that's an indication, although I agree with the Court, that this is summary judgment, we certainly should have the evidence viewed or the inferences viewed in our favor, in E&I's favor. The next point is the trial court, still on this contract issue, stated that Washington follows an objective manifestation test rather than looking for Rao's subjective intent. However, the court then does a 180 on a subjective manifestation test and suggests that for Rao, the change, the payment term, was a material one. That's at ER191, line 5. That sounds a lot to me like a subjective test. The trial court's conclusion that no contract had been formed as a matter of law was error in our opinion. If Rao's requested payment term was not a material change, objectively, as the court found, then viewing the evidence in favor of E&I, i.e., the real May 29th email, would require a finding that Rao accepted the contract. If that was enough, the trial court even described additional evidence favorable to E&I's position indicating that Rao had agreed to the contract. This is at ER190. That evidence related to the testimony of E&I principal Don Esch and his telephone conversation with Rao, which preceded the email you were referring to, Your Honor, where Rao agreed to the contract. This is Don Esch's declaration at ER56. In addition to that, there's also this email from Don Esch to Rao dated June 2nd. That's the one I think I was referring to, where Don Esch says, Thanks for your email accepting the contract draft. That's at ER157. June 2nd? June 2nd. You mentioned that before. It made me wonder if in the chronology I had missed one. That's ER what? 157, I wrote down. In addition to that, Your Honors, there's an email from Yelisetti, who at the time was working for E&I but later jumped ship and went on to work for E&I.  That's at ER157. He went to work with Rao and asked her. Yelisetti at the time wrote an email saying that, Contra Rao has agreed for the contract and had better understanding about the vision you have. Lucent has a different spin on what he really meant by that. Of course, Yelisetti now says something different. But viewing the evidence most favorable to E&I, the conclusion is inescapable. There can be no summary judgment on this point. Counsel, let me ask you this. At ER94, there's an email, and this is an email Rao sent to Barini stating, To overcome the constraint of lack of agreement, I suggest we sign the attached agreement as an interim measure. That's dated June 23rd, 1999. What's the effect of that in your view? Well, here's what happened in terms of the chronology. Now, June 23rd of 1999 is after, as the evidence shows, is after Lucent approached Rao. They admit they approached him. So they approached him June 7th through June 14th. You've got emails dated June 14th saying, It looks like we've got inter-Lucent emails saying, It looks like we've got a deal with Rao. On June 22nd, Rao sends an email to Lucent saying, You know what? I accept your proposal to work directly with you. The very next day, Rao sends this email that you're referring to, Your Honor, June 23rd. And this says to E&I, Essentially, it's take it or leave it time. Here's my proposal. If you don't like it, that's too bad. Here's, you know, I'll, and essentially, his agreement is, Rao's proposed agreement on June 23rd. After the evidence shows he already has a deal with Lucent, his agreement with E&I is, You know what? No non-solicitation clause. You know, because he, of course, he has all the letters. Does that indicate there was no agreement on the non-solicitation clause before? No, Your Honor. I disagree with that. What it indicates to me instead is that even if there was an agreement between Rao and E&I, because things changed later between Rao and Lucent, Rao has turned around and said, You know what? Let me make it seem like we're still negotiating. And, of course, at this time, E&I had no knowledge that Rao was negotiating with Lucent. Rao and Lucent and Lucent's representative are in India. E&I is here doing the, you know, some of the behind-the-scenes work with Tom Hiller, the technical advisor. They don't know what Rao's up to in India. And what he was up to, we know now, is that they were negotiating a contract, which concluded on June 22nd, the day before he sent this e-mail. And how about the conversation that Mr. Donish talked about in his deposition sometime around the end of May, which would be before the date you said that there was a contract between Rao and Lucent? And in his deposition at ER 146, Mr. Donish stated, I really cannot specifically say that he said, Yes, I will sign the contract. What's the effect of that testimony? Well, I think the effect is that I would hope that a jury would be able to evaluate his credibility, that it's been many years. It was one conversation for him to say late May. Was it June 1st? Was it late May? I don't think it necessarily indicates anything perhaps favorable or disfavorable to us, other than they were talking about it, and Donish seems to suggest that his understanding was, although I can't point to a specific language that Rao may have used, was that they had a deal. And then you have, of course, the written e-mails confirming that he had a deal. And I would say that the May 29th e-mail from Rao effectively confirmed that, yes, Rao says, I have agreed to your contract. It seems like a lot of offers and counter-offers to me. I just, you know, in the business world, I can't imagine that this is the way that contracts are effectuated through e-mails back and forth, still negotiating the terms. I would tend to agree with you. It was not the best case scenario, obviously, but due to the time constraints imposed by Lucent, E&I was supposed to have its people out there in India working, but unfortunately once Rao and his team were out in India, it became progressively more difficult to get Rao to sign the contract that he had agreed to. Part of that reason we know now is that right around this very, very short period of time, Rao started talking to Lucent directly about working directly with them, and then of course it only makes sense that he would back out of the agreement. An economic breach, frankly. It probably, even if Lucent is held viable, it probably makes sense in the long run. But that gets me to the next point, which is even if there was no contract, was there a valid business expectancy? The trial court said no. The trial court stated that based on the evidence, there was vigorous negotiations, and because of that, E&I may have had a general expectancy with its relationship with Rao. That's at ER 192, line 10. However, the trial court claimed the pecuniary value of E&I's expectancy depended on whether Lucent awarded future projects to E&I. E&I, quote, E&I has provided evidence only that Lucent was satisfied with Rao's work in the Hyderabad project, not that Lucent had agreed or was even likely to award it future work as Rao's broker. That's at ER 192. But E&I did provide evidence that Lucent had agreed. In fact, the trial court actually refers to that evidence on the second page of the same order. That's ER 173, line 20, and I quote, E&I claims that near the beginning of the India project, Lucent representatives informed or promised that if E&I's work on the project was satisfactory, there would be future Lucent projects in locations such as Guatemala and Puerto Rico. Also, there's the deposition of Arconeg. Where is that in the record? That is, talking about the order, that's. Where is the, where is, what's the source document or the source declaration or, where in the record is that statement? That, I believe, Your Honor, would be, I think what the court was referring to was the Vahid Bahraini, the president of E&I's declaration, which I can find for you if you like. Bahraini's declaration, in your view, said that someone from Lucent said, if we're satisfied with your work, you can expect more in the future. They promised him. The court refers to it as a promise. They said, the court. Can Lucent be held liable for interfering with an expectancy regarding business with Lucent? I mean, it's a principle in that transaction. Yes. I think they can. Lucent argued otherwise, of course, in the trial court. I think correctly said no, that Lucent was not correct about that. I think they can. I think it's just a simple matter of E&I has this employee that it's found, that it's not only found him. I know the court refers to E&I as some sort of broker, like a temp agency or like a monster.com or something. But it isn't. It's much more than that. It teaches people like Rao and his team members how to do these things. Previous to this job, Tom Hillard, in his declaration, he stated that Rao did not have this sort of expertise. Lucent talks about previous work that Aster performed for Lucent. That was digging ditches. Rao did not have this type of work, this type of experience or technical knowledge. So E&I provides that and spent many, many hundreds or thousands of hours providing this sort of technical expertise, only to have Lucent come in, because it's physically there with Rao in India, and essentially take Rao away knowing that E&I and Rao are at a minimum vigorously negotiating contract terms. Counsel, let me ask you this. Are you familiar with the case of Awana v. Port of Seattle? No. I think the Washington Court of Appeals says in that case a party to a contract cannot interfere with its own contract. But Lucent wasn't interfering with its own contract. That would be interfering with the Lucent E&I contract. That's what you said, that there was an expectancy of future business from Lucent to E&I, and that's what Lucent interfered with by taking Rao away. That's our argument. I understand what you're saying. However, I would say that the contract between Lucent and E&I was for the Hyderabad project. What I'm talking about is future projects, future contracts. With Lucent. With Lucent. But I haven't read the case, Your Honor, but I hope that the case says that they're talking about the contract, in other words, analogous to our case, that the Lucent E&I contract for Hyderabad project, Lucent E&I can't complain about E&I's interference with that contract. I see I'm almost out of time. I'd like to move on. Okay. All right. Thank you. Good morning, Your Honors. My name is Steve Winterbauer, and together with Adam Kopp, we represent the appellee respondent, Lucent Technologies. I want to jump first into precisely the area that counsel was just talking about, which is the tortious interference claim, both on the basis of a contractual relation and on the basis of a business expectancy. I'm going to highlight a few angles on that. I think the Court has already indicated its awareness of one or two that I will keep at a minimum. On the contractual relations issue, that claim doesn't even get out of the box unless there is a genuine issue of material fact as to whether a contract actually existed between Mr. Rao and E&I and that that contract included some sort of a non-solicitation provision that extended to contact with Lucent. The testimony that is given to support the idea that there is a contract comes from three sources. It comes from Mr. Bahraini as the president of E&I. It comes from Mr. Dinesh, his brother and another officer at E&I, and it comes from Sai Yelasseti, who at the time was also a representative of E&I. Mr. Bahraini, as we point out, and we cited the correct portion of his deposition, testified that he personally never had any conversations with Mr. Rao about this. Let me change the angle just a little bit, because it seems to me it has to be a given, let alone something that's accepted for summary judgment purposes, that there was a contract of some kind. Rao did work. Rao got paid for work. Nobody thought this was a charity case. There was an understanding. The problem is defining where the understanding went, whether it encompassed the non-compete clause. And so some of the broad statements on both sides, I can't put a whole lot of stock in, because the reality of it in the current business world is that you launch on some projects sometimes when all the things aren't crossed, but there's an agreement between the parties. The problem for this case is that, and what I want you to focus on, is that one of those terms that may not have been nailed down is the term that matters for this, whether there was a non-complete, non-solicitation provision. And what is there that, accepting, again, summary judgment, viewing things most favorably to the non-moving party, what is it that should make us so confident here that there clearly wasn't an understanding with regard to a non-compete clause? First of all, I don't disagree with the Court at all that there was some sort of understanding. In fact, it's undisputed that Astor, Rao's company, signed a memorandum of understanding with E&I years before this particular work was ever undertaken. And all that did was say, we'd like to do business in the future. To the extent we do, that business will be subject to whatever terms and conditions we agreed to at the time. So I don't disagree that there was some understanding. I and Lucent do not have the burden, First of all, Your Honor, of coming in and disproving the existence of the contract. The question is whether the other side has brought forth sufficient evidence upon which one can reasonably infer that a contract existed and it included that specific provision. That's where the Court correctly said, no, there is not that evidence. The only evidence that was provided on that point was from the three sources I just identified. And Mr. Yella said he came in and actually said straight up in a declaration, Mr. Rao never agreed to any contractual provision that extended to non-solicitation of Lucent or its clients. Well, sort of the May 29 disputed communication from Mr. Rao as to which there are two versions. And for summary judgment purposes, is it your position that only one version can be looked at? No. Are both versions on the table? I would agree that both versions are essentially evidence. I mean, they're part of the record. But I have the version that seems to say, I'm ready to agree, raises, I guess it's the payment term issue, an issue other than the non-compete clause. Isn't that something a jury could look to and say, well, as to the non-compete clause, there was an agreement between the parties? No, not in this case. And this is principally because you have to look at the entire course of dealing. The Washington law, New Jersey law, Virginia law, any source of law that the parties have argued might apply here, all accept basic contract formation principles, number one of which is if there is a new term introduced in the course of the discussion, that is by definition a counteroffer. It does not mean that, oh, okay, whatever we talked about before is enforceable, but now that you want this, that we can carve out. Well, parties can reach an agreement and propose to amend the agreement. That would presume that there has been, in fact, a fully enforceable valid contract entered into in the first place. For example, if here we had some situation where, say, three years earlier, they've got some sort of an agreement, either oral or written, they've been operating under that agreement, and then later there is a national express agreement on this new term, I don't disagree with that. But that's not this situation. What we have here is a series of verbal conversations as well as e-mails that are all in a tight, very tight time frame from approximately mid-May through the end of June. And those need to be read in their totality. They show an ongoing tit-for-tat, back-and-forth discussion, even if one accepts all the inferences that E&I wishes to focus on. I'm focusing on May 29. It seems to me that's the one communication that arguably does reach or does express agreement on terms, save the payment term, which we can argue about whether or not that's material. Clearly, it's not pertinent to the non-compete issue. And so that's why I focus on that, and that's why I focused on June 1 with your colleagues, because it seems to me that's the time where the ships come the closest. And whether they actually get to that point or veer away is hard to tell. Absolutely. But the hard-to-tell part, for summary judgment purposes, is where the Court starts saying, well, if it's really hard to tell, then I've got to leave it for the jury. Well, we have the May 29, the two different e-mails that occur on May 29. Then we have the June 1 or June 2, whichever it was, that comes back. Now, if we accept these at face value, the June 2 document on its face indicates that there is no agreement and that even if there was a prior agreement, it was based on a misunderstanding about what the terms were that were under consideration as they relate to non-solicitation of clients. His June 1 or June 2 e-mail, the one that went from Donesh back to Mr. Rao, says in it, essentially, there are two issues yet to be resolved. First, strange language, that there's already been an agreement two days earlier on May 29. Number two, he says, the contract that I sent to you, i.e., the contract that allegedly forms the basis for the agreement purportedly reached via the May 29 e-mail, is inaccurate. It doesn't have the proper non-solicitation language in it. The real language that's supposed to be in there is not just Lucent. The real language is supposed to be Lucent and its clients. That clearly shows, read together, only one reasonable conclusion. There was never an agreement on the terms that E&I has been trying to press since 1999, and every court can get to listen to the case. That's the totality of that evidence. Counsel, let me ask you this. If there is no written agreement between the parties and the Mr. Rao nevertheless commits to work, would that be a quantum merit situation where he just gets paid for his work and everything else is out the window? How does that scenario flow? Well, if I'm understanding you correctly, Your Honor. Well, I was just trying to follow up on Judge Clifton's observation. There was some type of understanding because Mr. Rao worked and he got paid. Right. So I'm asking you how that scenario played out between the parties. That's it, in a nutshell. I mean, there was discussion, and there is no disagreement about this, that there was discussion about retaining Mr. Rao and his company, Aster, for purposes of rendering services on behalf of Lucent on the Hyderabad project. That's clear. There was discussion about what the basic terms would be insofar as what's the nature of the work, who else is on the team, how are the payments going to be processed, this sort of thing. All of that is in the record, and no one disagrees. But that does not the fact that there was some verbal agreement on certain terms that the parties then performed under does not lead to any sort of reasonable inference that those terms included an express non-solicitation provision. People are retained all the time on the basis of a handshake and comments. Someone may be retained to assist. Microsoft may retain somebody. All right. They bring them in. They say we want you to work on this project, so on and so forth. They know, though, that if they intend to have that person be restricted from any sort of competitive activity in the future, they're going to need to make sure that there is an express agreement on that piece. That is something that isn't just inferred out of thin air. There has to have been some actual negotiation and agreement on that particular provision. And here there isn't. There's no dispute. There's no written contract. And through the basic evidence that I've just walked through, particularly the June 1 email read in connection with the May 29 email, there was never any agreement reached on the non-compete. E&I has only itself to blame on that particular piece. E&I didn't even turn around and request that an agreement of any form be signed until practically a full month into this particular project. So there is just no evidence from which that can be that type of a restriction, that type of a restraint can be inferred. Let me ask you a different question. Yes. If we agree with you that the motion for summary judgment was properly granted, does that moot your cross-appeal? It does. Because our cross-appeal really was addressed to the issue of the choice of law. And on that conflict of law and choice of law analysis, and on that particular subject, Your Honor, I'm not going to spend my time here at oral argument rehashing those arguments that I think are adequately set forth in our case. I really don't think you appealed, to be honest. You didn't do a ñ you didn't appeal ñ you didn't file a notice of cross-appeal on those issues. And so you're ñ We did, Your Honor. Right. But we did cite case law that says that basically any alternative basis for affirmation of the district court's ruling is ñ You're not trying to affirm the district court's ruling on that particular issue. You're challenging the district court's ruling on that particular issue. I'm challenging the district court's selection of choice of law. That challenge, though, goes directly to affirmation of the overall ruling on liability. Stretching. Well, that's what the case law seems to say. How many judgments rendered in this case? I assume just one. There was ñ well, there was one judgment and two orders. Let me, if I can, go back to the contract issue, though, for one moment, because I think one thing is getting lost. Even assuming a contract existed, that does not end the analysis. All that does is get one prong of the tortious interference with contractual relations claim sufficiently satisfied to survive summary judgment. There still needs to be proof of knowledge by Lucent that they knew that there was this contract in place, and there also has to be evidence that there was improper interference, which may ñ which means that there has to be evidence of malice or some other unlawful means of interference. And that's where the case falls apart again for summary judgment purposes. For example, we have cited case law that shows that under circumstances somewhat similar to what we have here, it is not reasonable to infer that the person or the entity in Lucent's position had sufficient knowledge of the contract. E&I's position is, Lucent, you had knowledge because we told you that he had verbally agreed to this contract. That's their case in terms of the knowledge. That doesn't cut it. If that's all that was required, anybody in any of these situations would come up and just make some self-serving statement that, hey, he's got an oral agreement with us that includes some noncompete. He can't do business with you. The evidence shows that on the ñ on the knowledge issue, what Lucent had before was one party saying I signed, another party saying I didn't. What were the extra circumstances that Lucent had before it? Lucent didn't have the benefit of some forensic computer scientist that looked at a hard drive four years later. Lucent at that time knew that it had done business with Aster, Raoul's company, in the past. It knew that there was no contract between it and E&I that had any restrictions on its ability to retain Raoul or Aster. It knew there was no written agreement between E&I and Raoul. And there were other facts that are undisputed in the record that are further suggestive of a business-to-business, arm's-length relationship between E&I and Raoul. For example, E&I being ñ invoicing Aster, not Raoul. Raoul ñ Let me shift you back to the legal part. Sure. It seems to me that part of the problem here, in my mind, is that at some point Lucent takes the risk of being wrong. It is, as you say, a murky set of facts that Lucent, you're saying, shouldn't be required to accept the say-so of E&I. And yet, suppose it turns out there's this ironclad agreement that Raoul's busy denying and E&I is busy saying to Lucent, we've got this guy locked up, because Lucent tried to close his eyes. It seems to me at some point, if Lucent keeps going after having been given notice, the law suggests that Lucent proceeds at its risk. I don't disagree with the general idea that under this circumstance, the company in Lucent's position proceeds at its risk. I think that absolutely is the case. So here, suppose it turns out that a jury determines there was in fact an agreement between E&I and Raoul that includes this noncompete clause. Why isn't Lucent at risk there? Well, there's two different issues there. First of all, we've got the whole issue about whether there was in fact some contract. We beat that one to death. All right. And we know that if there is no contract, then there is no claim. Let's assume the jury says, or you folks say, hey, there's enough there to get by. All right. Then the question is not how strong is this evidence sitting here now in 2006 of the existence of a contract. The question is for liability purposes and summary judgment purposes, what facts did Lucent know or should have known of back in 1999 when it and its in-house counsel were looking at this issue and trying to decide? And that's where I pause, because I don't know, I don't understand that there's a law that would support the proposition that says Lucent could close its eyes to the fact that it knew it was dealing with Raoul, Raoul under the guise of E&I. So Raoul is identified to them as an E&I person. And E&I is saying to them, we got Raoul locked up. Understood. Isn't that enough by itself to put Lucent at risk of proceeding if they're wrong? It's not, Your Honor. There's case law that we've cited in the – in our brief that deals with this situation, not these specific facts. No one could find these specific facts. But it does deal with situations where both there is a contract in place, which I'll come to in a moment, and situations where there was alleged to be a contract. And the Court found that under the circumstances that were present at the time that the entity in Lucent's position was trying to figure out what is our level of risk, the Court said that there wasn't sufficient evidence to put Lucent on notice that they were – that they were tortiously interfering. You can have – again, it is important to look at this situation from the evidence that existed back in 1999. There was no forensic evidence at all. The e-mail, frankly, wasn't even presented. What we have is E&I saying, we've got this guy locked up. And every other objective indicator, every other indisputed fact. One other. And that is that Rao comes into this from Lucent's perspective as an E&I person. It's not E&I saying, this guy over here that we've had no dealings with and you know independently is our guy. Rao comes into contact with Lucent wearing an E&I uniform. And that's the additional piece that really gives me pause here. Well, but I think it's being overstated quite candidly, Your Honor. There is no evidence, even though it gets repeated constantly, that Rao was some employee of E&I. The evidence is that – As far as Lucent is concerned, does Lucent have any independent reason to think that Rao is not being given this assignment to work on the India project by E&I? It seems to me he's introduced to them as an E&I consultant employee something. He is introduced to Lucent for purposes of this contract by E&I. That is the most that can be said. And that's why I've avoided – I use the absurd analogy of wearing an E&I uniform. He's not an employee. He doesn't fit that model. That's right. So he's coming in here somehow under the auspices of E&I. And so Lucent has reason to think there's some relationship between them, even if he doesn't know the full dimensions of it. Well, absolutely. But that's not definitive. Everyone would agree that Lucent – let me back up. Everyone would agree that if this particular person, Rao, was, in fact, an employee of E&I – let's make it an at-will employee of E&I. The case law, at least, is very clear that Lucent, despite that existing, on-the-table, everybody-knows-it's-there relationship, Lucent would be within its You're doing a nice job. How about coming and working for us? Key words there being at-will. And I guess I have to pose the question, in this field of technical expertise, where noncompete provisions are hardly unheard of or unknown, was it fair for Lucent to presume that there wasn't some kind of obligation on the part of Rao? Under these circumstances, absolutely. Absolutely. And the testimony was that – the testimony was consistent with the first part of your assumption there, which is that noncompetition agreements are not uncommon in this area. That was testimony from a variety of different sources. The corollary to that was – and they're in writing, because everybody knows in this particular field there is great fluidity of the workforce. This is the field where the mobile workforce, the telecommuters, the contract employees predominate. And the testimony across the board was that you ask, just like Lucent did, do you have any restriction? When that party says, no, I have no restriction, and the other side says, we don't have anything in writing. And don't forget that this is – Rao is an individual who has his own company in India. And his employees, not E&I's employees, are doing the work under the auspices of Rao's company, which is Aster Industries. And Lucent knows that. Lucent actually retained Rao through Aster and worked with them before E&I ever introduced these two parties. All right, counsel. You've exceeded your time. Thank you very much. Thank you. Rebuttal. Very briefly, Your Honors. The court correctly stated Rao was paid under the contract that was agreed to. Rao was held out and held himself out as an employee of E&I. The fact is that E&I trusted Rao when they sent him there. E&I trusted Lucent when it sent Rao, that Lucent wouldn't poach its employee. There was a duty of loyalty, I believe, between E&I and Rao that was – But this suit isn't against Rao. This suit's against Lucent. Correct. And you have something – is there a duty of loyalty on the part of Lucent or do you have an agreement with Lucent that says they won't come in and hire away your employee? Well, I think what Lucent did is it interfered with the duty of loyalty between E&I and Rao. And the final point is Lucent never bothered to ask E&I, back when it was asking its own in-house attorney. Back on page 22 of our appeal brief, we talk about how Koenig wrote on June 16, 1999 – I'm sorry, Petillo wrote to Koenig on June 16, quote, Hello, Contra Rao is looking for a PO number. I've given the details to Rita and we're waiting for word from you after you have had the chance to speak to Steve Rosen, the attorney. That's Lucent's attorney. So they knew that there was a potential problem back on June 16 before they made a deal with Rao on June 22, but they never bothered to ask E&I. They kept everything secret. Thank you. Thank you. Thank you to both counsel. The case just argued is submitted for decision.
judges: Rawlinson, Clifton, Marshall